This video is a derivative work of the Touhou Project.     This video is a derivative work of the Touhou Project. The United States Court of Appeals for the Federal Circuit is now open in discussion. The first case this morning is number 09-1081, Ajinomoto, against the International Trade Commission. Mr. Morgan. Good morning, Your Honor. May it please the Court. In each of the patents in suit, the Ajinomoto inventors claimed a better way to make a single one of the 4,000 E. coli genes better for the production of lysine, mutating a gene that otherwise would stop the production of lysine in the case of one patent and mutating a gene that otherwise would decompose the lysine produced in the case of another. All GBT had to do to design around these two patents was to remove these two gene modifications. When it did so, Ajinomoto agreed that GBT no longer infringed. The best mode inquiry here should have ended when GBT's own expert acknowledged that the Ajinomoto inventors had disclosed the best genes, the best modifications to those genes, the best way to do those mutations, and the best way to insert them into an organism. But there were preferred strains for each of these patents and they weren't disclosed. The administrative law judge at the ITC ignored that testimony that I just mentioned and didn't even mention it in his decision. Instead, what he did is just what you pointed out, Judge Lurie. He, in effect, turned the best mode requirement into a strict liability test. He looked and he said, is there any preference that the inventors have that relates to any word in these claims? His rule was if there is a preference that the inventor has that he perceives, then the patent relates to the nature or scope of the invention, whether the disclosures in the patent are adequate to allow one of skill in the art to practice the genetic modifications. What was known in the art? What was the production data? But you're claiming a microorganism and it's clear, I think, that the best mode, at least it's a fact-finding, was WC80196S and that was not disclosed. The ALJ did find an inventor preference for that strain based on the fact that if you read his decision, what he said was it was the only strain that Dr. Kikuchi, the lead inventor on the 698 patent, was using at the time. Therefore, by definition, it was the best. What the ALJ didn't do, though, was to look at the nature and scope of the invention. What he, in effect, did was... But you're questioning the ALJ's fact-finding, to which we owe deference. No, we are not questioning his fact-finding. The scope of the best mode inquiry, the legal standard to be applied, is a legal question and that is what we're challenging. What he did was, as the claims became narrower, as the claim moved from a claim to the gene modification to a bacterium transformed with the gene modification and finally to using that bacterium with the gene modification to produce lysine, the claims became narrower. In the ALJ's view, though, the disclosure obligation became much, much broader. In his view, as we limited the claims, we had to disclose more. The fundamental error that he made in applying the best mode was saying that this patent claim encompasses the overall production of lysine. Thus, he required the inventors to disclose anything that he perceived to be a preference. Claim 15 in the 698 patent, for example, does talk about the method, referring to Claim 13, method of producing lysine. Yes, it does. The host strain is an integral part of that method, is it not? You need to have a host strain, no question about that. The question is, what did these inventors claim to be their invention? If you read the specification of both of these patents, they acknowledge that the prior art included the production of lysine by using a bacterium in liquid medium, fermenting it, collecting it, accumulating it. But it does sound like you're asking us to define the best mode as having some sort of an inventive step or an inventive component aspect to it, rather than the best mode of the claimed invention as a whole. No, I think the two are the same. This is not infringement analysis. It's not doctrine of equivalence, where every single word has to be parsed. And if any word is not covered by the alleged infringing product, it's not an infringement. Here, the best mode in this court's cases, including the teleplex decision that Your Honor wrote, the term clip, in that case, was clearly in the patent. I mean, that was a term. And what the teleplex court held was, yes, clip is in the claim, but there are no claims made with respect to what that clip is, what it looks like, what its hardness is, what its thickness is. And in the end, you found that the specifications... But those were characteristics that were specified by the customers and really didn't affect the invention. But here, this is a little different, is it not? There's actually no evidence, and there was no finding by the ALJ, that the host strain materially affected the way the genetic modifications work. And, in fact, the whole purpose of the disclosures in the 160 patent, the choice of a threonine-producing strain and a wild-type E. coli strain, was to demonstrate that if you introduce these genetic modifications into any host strain, it has the effect of making it better at producing lysine. And that was the invention here. It was using specific genetic modifications to make the production of lysine by a microorganism better. Otherwise, and what the ALJ did here, was effectively to require the disclosure to be a treatise on the production of lysine. How about the use of sucrose? The use of sucrose epitomizes what the ALJ did wrong here in several respects. First, the evidence was uncontroverted that the choice of carbon source, sucrose, glucose, would be based on price and availability in a given location. The essence of a production detail. The ALJ didn't discuss that at all. Secondly, he did discuss the other uncontroverted piece of evidence, which was that the use of sucrose and sucrose utilization genes were known to a person of ordinary skill in the art at the time. GBT's own witness agreed with that, and the ALJ specifically said, Ajinomoto is right about that, but it doesn't matter. And the reason it doesn't matter is because he was applying the strict liability test. He said, I find the inventor had a preference for sucrose. The patent doesn't say he had a preference for sucrose. Therefore, it's a best mode violation. First of all, he did not even make a finding that the use of sucrose, which he correctly characterized as an unclaimed element, had any material effect on the invention. Secondly, he didn't- Of course, I misspoke earlier when I said the invention is the microorganism. It's obviously a method, a method utilizing the microorganism of Claim 3. And the method works best with sucrose, doesn't it? No, and there's no finding that it does. The most that the ALJ ever said was he said, The evidence suggests that the production of lysine would be greater with sucrose than glucose. The evidence was mixed when the two were compared in various experiments. What about the 160 patent? It seems to me you're arguing that, in your brief, that the failure to recite AE 70 as the best mode only related to the priority date. But that wasn't argued earlier, was it? I'm sorry. That issue was waived. Well, we don't believe that it was waived, Your Honor, because that's just an application of the law. That wasn't an affirmative defense. It wasn't something we had the burden of proof on. It's an error of law in the decision here, because under Section 120, the U.S. patent is only entitled to claim priority to foreign application to the extent that it meets the requirements of Section 112. And this Court's cases, including probably most recently Bayer, but other cases that we cite in our brief, stand for the proposition that the consequence of not complying with the best mode requirement in a foreign priority application is that you cannot rely on that for priority. Now, in many cases, the consequence of that is the U.S. patent is invalid because there's intervening prior art. There was none in this case. So the only legal consequence of the ALJ's finding with respect to the 160 patent is that Ajinomoto cannot rely on that foreign priority date. But the consequence of that is the patent is still valid because there is no evidence of any intervening in validity. Are you relying on the fact that there was a separate patent on the use of sucrose as somehow mitigating the omission of sucrose from the list of carbon sources? No. That patent actually supports what we say, Judge Newman, because, first of all, that patent specifically cites the 1988 Dumouldoff article that is one of the prior art references from which the Ajinomoto inventors got the sucrose utilization genes that they used in 1993. And the ALJ's own decisions quotes an internal Ajinomoto research report saying we got that gene from the B399 strain of bacteria, and the 623 patent requires that the sucrose utilization genes come from a different strain, including the VPKMB7915, I think it is. Was there a separate deposit at that time? As I recall, the 623 inventors who were, by the way, Russian. It just happens to have been assigned to Ajinomoto. The Russian inventors, as I recall, did make a deposit. But these events are 12 years apart. The genes came from entirely different bacteria, and it's very vague what the ALJ had in mind when he even made reference to that 623 patent. Let's hear from the other side, and we'll save you rebuttal time. Thank you. Let's see, Mr. Wirth for the ITC. Good morning, and may it please the Court. I'd like to begin with the 698 patent. In withholding WC80196S and putting a different strain on deposit, the patentee concealed the preferred microorganism, which is part of the claimed invention. We note that Ajinomoto does not and cannot assert claims 1 and 2, which claim the pinpoint LDC mutation. Rather, Ajinomoto asserts claim 15 for a process using a microorganism. Ajinomoto benefits from this quid pro quo of a greater, broader claim scope because it can then bring this action. The disclosure requirement does not impose an undue burden on the patentee because the patentee drafts the claims, which set the boundaries of the best mode disclosure requirement. The claims are interpreted according to ordinary principles of claim construction, including the principle that no claim limitations are ignored in construing the claims. In addition to being a claim limitation, the microorganism is an integral part of the process, and I would refer the Court, if I may, to A128 and 129, which show the interrelationship of the metabolic pathway and to the confidential record at A7325. It is also, while we're providing record sites, it was not known to a person of ordinary skill in the art that this would have been a beneficial microorganism, and that can be found at A- that wasn't disclosed. He said there's a suggestion in the record. Is that right? The ALJ had three independent grounds or bases for finding a best mode violation. The first one, which I've been talking about, is the failure to disclose the host strain or microorganism. Are you talking about 698? Yes, on the 698 patent. The sucrose and the fictitious data, we would rely on our brief on the 698 patent for those grounds, unless the Court has any questions. As to the 160 patent, the ALJ issued ground rules requiring the parties to set forth in a pre-hearing statement their contentions of everything that must be developed in the evidentiary record at trial. These ground rules issued in accordance with the APA are analogous to local rules or local patent rules that a district court may issue and are analogous to a pre-trial order that a district judge may issue. These rules allow a trial judge to manage a case by requiring the parties to set forth contentions for discovery and trial based upon these representations. A common example would be to require the parties to propose claim constructions so that a Markman proceeding may proceed based thereon. Mr. Werther, let me take you back a little bit to your comment about fictitious data because a good deal is made of that. We know that prophetic data and so on is not unusual in patent applications. How far did the ALJ go in believing, or did he believe, that data had been omitted or selected or changed? What was behind that conclusion? The ALJ believed that this was concealment, although under the case law it is not necessary to show an intent to deceive. The ALJ did find an intent to deceive, and that is discussed in his inequitable conduct section where the intent was based upon the submission of fictitious data. And the materiality for that inequitable conduct finding was based upon the relevance of the best mode statutory requirement and specifically the microorganism and carbon source withholding. But the inference of intent was pretty weak, wasn't it? Just an inference. There was no clear evidence of intent to deceive. The ALJ stated that there was a pattern of nondisclosure. That's equating failure of best mode with inequitable conduct. So at that point there may be an inference, as would be permissible under the inequitable conduct. That's pretty weak. It's pretty weak for finding inequitable conduct. There may be an inference. First I would submit that this court may not reach the inequitable conduct issue if it agrees with the best mode violation. As to the pattern of nondisclosure, the ALJ looked at the fact that the patent lists numerous carbon sources. Why wouldn't we reach the inequitable conduct holding if we agree with you on best mode? Inequitable conduct is sort of an in personam stain in one's record. And failure to fulfill a best mode requirement is one thing, but inequitable conduct is another. In this case, there's only one claim asserted. So as a matter of law, the effect would not change the outcome of violation of section 337. This court could, of course, reach it if it wanted to look at the personal issues or implications involved. Mr. Worth, my understanding is that Ajinomoto does not really argue about intent and doesn't dispute the ALJ's finding with respect to intent. Am I correct? The challenge, I believe, is primarily based upon the best mode materiality. Relating to the materiality side of the question. And my sense of reading the briefs was that that was the challenge, that the nondisclosure was not material and intent was not really contested. I agree that it may not be challenged, except for the challenge to whether there was a best mode disclosure or nondisclosure. You mentioned at the beginning of your argument that the ALJ found three bases for a best mode violation with respect to the 698 patent. Yes, Your Honor. Those are alternative bases? Those are. Any one of them could stand alone. So that for the appellant to succeed, it has to convince us that all three are wrong.  Thank you. Thank you. Ms. LaPorte? Good morning. I'd like to talk about why the ITC was correct and should be affirmed. You're not surprised. This case goes to the very core of the best mode requirement. Unlike a lot of the cases where things are very much at the margins, here what happened was that the preferred embodiment of two patents was not disclosed. The material that was not disclosed was expressly claimed. The material that wasn't disclosed was important to the basic purpose of the claim, which was to produce lysine. The ALJ found that the omitted material was material that the skilled artisan would not know about. In fact, with regard to sucrose, Ajinomoto held that material back and then obtained a patent on it years later, which it now enjoys a long patent term on as a benefit of its nondisclosure. I'd like to go back to some of these issues of inequitable conduct that were raised just at the very end of the conversation with Mr. Wirth, because I think that it's important both for the best mode and for the inequitable conduct issues here that it be kept in mind that the ALJ made an express finding that fictional data was placed in these patent applications and published, and that there was an intent to deceive, and it's correct that that intent to deceive is not challenged here on this appeal. That was a factual finding that was made. It's past us now, and it's really not something that is up for grabs in this appeal. So just sort of stepping back for a moment, the ITC found that Ajinomoto put enormous effort into the development of these host strains, and the millions of dollars that are referred to in Ajinomoto's brief relate to the development of these host strains more than to the development of the mutations that are also part of the claims that are in issue. In addition, Ajinomoto put huge effort into trying to figure out what the optimal carbon source would be, the essential part of the liquid medium that is also recited in Claim 3 of the 698 patent, and that wasn't disclosed either. Ajinomoto has talked a little bit about the scope of these claims and how they differ. Mr. Malkin characterized the claims as you go from the early ones in the patent to the later ones as getting narrower. But in fact, in a way, it's really only the fact that they invoked these production claims that permitted them to even invoke the jurisdiction of the ITC. All of my clients' activities occurred in China, and so claims to a gene, a mutant gene, or even a microorganism are nothing that they could complain about because they all occurred extraterritorially. The reason why we are here now is because Ajinomoto chose to enforce claims to the production of lysine, and it's the production of lysine that therefore needs to be the focus. I suppose I should interrupt you. You speak as if there's something improper about that. No, Your Honor. I'm not attempting to imply that there's anything improper. What I'm saying is that because of the varying scope of these claims and because in a certain way using a mutant microorganism to produce lysine gives you a different scope, it gives you the ability to engage in this industrial process for the production of lysine. So I'm in no way suggesting that there's anything improper about that, but I am saying that the claim scope is important here because it is the scope, the production of lysine that even allows this to be a case that's in the United States. So we're not talking about a claim here to a particular mutation. This is a claim that recites mutations. It recites a microorganism. It recites a liquid medium, and it is designed for the production of lysine. So I'd like to respond also to some of the things that have been said about the suggestion somehow that these aspects of the claim were not novel and not important. First of all, that's not the law. As Mr. Wirth pointed out, the novelty of a claim is as to the claim as a whole. But I really think that Ajinomoto's argument is premised on the notion that if you claim something very broadly with very few specifics in it, such as a microorganism, that you don't have to really disclose anything about your best mode for that. So the argument, as I understand it from Mr. Melkin, is that the narrower the claim element, that's what you have to disclose the best mode of, but if you claim something very broadly, you don't. And I think that that's exactly the opposite of what the best mode requirement is designed for under the cases of this court, because it's where you have a broad array of potential choices, that it is singularly important to disclose that which is the best. And if you look in our brief, you'll see that the difference in the amount of lysine that could be produced, depending on the particular microorganism that was used, was enormous. The things that were withheld had tremendous significance. Are you referring to the deposit, which microorganism was deposited, when you talk about withholding? When I was talking about withholding, Your Honor, I was referring to all the different things that have been withheld here, particularly of the microorganism. With regard to the 160 patent, there's no question that there was no deposit of the preferred microorganism. As to the 698 patent, the microorganism that was deposited was not the one that the inventors preferred, and in fact it wasn't even the one that the inventors used. That microorganism was never used for anything other than derivation of others, and to deposit, presumably to cover the tracks of the fact that they had a preferred microorganism that was not disclosed, along with the nondisclosure of the sucrose that was the preferred medium for that particular microorganism. If you look at column 10 of the 698 patent, you'll see that there is a disclosure about what the medium was that was used, and it is listed as being a glucose medium when, in fact, it was sucrose. And earlier in the patent, it lists numerous different carbon sources of which sucrose is not one. But you have to have the sucrose utilization gene in order for sucrose to be preferred. That's right, and so by failing to disclose the fact that the preferred microorganism for lysine production did not contain sucrose utilization genes, and by not suggesting that sucrose was even a possibility, that was something that enabled Ajinomoto to not have to disclose any of those facts about its preference. If that's a separate invention, let's say an improvement, and whether it was or wasn't later put in another specification, it does raise the question of how much needs should be included in the basic patent. And then when you do come up with an improvement or decide that your improvement should be separately patented or is separately patentable, to put that in another patent, which does then disclose the sucrose. Your Honor, the difficulty here is that the only strain that they ever used to practice this claim and to exercise the LDC gene mutations was the strain that was not disclosed. And so it can't be characterized as a later improvement because we have no idea how well or whether the LDC mutations would have worked with regard to a strain that did not have the sucrose utilization genes. I'm sorry, I thought that my time was up. All right. You're over your time. Is there anything else you need to tell us? Well, as to the 160 patent, I guess I would like to turn to that for a moment because the ITC found in the exercise of its discretion based on its own ground rules that this issue was waived. So it's not an issue of a pellet waiver. It's an issue of the ITC enforcing its own rules. And as I understand it, the argument from Ajinomoto's side boils down to the notion that if you don't bear the burden of proof on something, you don't have to disclose what your contentions are. And that just runs contrary to the whole concept of local rules, of courts being able to enforce disclosure requirements. And it's very, very unfair to people who are trying cases not to know what they're up against. Finally, I just wanted to say on that, that insofar as there is any concern about the justice of applying the waiver here, if you look at the difference between the original Japanese patent application and the PCT application, you will see that there is no new disclosure of a better strain. They made further disclosure using the existent strains that they had talked about before and that they never really used. And then they disclosed another strain that was actually worse, but they never disclosed a strain that was preferred at any time. Thank you. Any questions for this report? Any questions? Thank you, Ms. Report. Mr. Milken. Thank you. What you just heard from Ms. Report with respect to what the Ajinomoto team was doing in its laboratory in terms of a vast research project, all true, all irrelevant, all improper for the ALJ to have considered here because it goes outside the scope of the patent itself. What GBT argued for today, what the ALJ in effect found, was that the claim here really reads a method of producing lysine comprising taking a microorganism, cultivating it in a liquid medium, accumulating the lysine, and collecting it. They have written the genetic mutations that were the essence of the invention completely out of the patent. It's gone. And what was left was a requirement to disclose everything that the inventors in the ALJ's mind had a preference for related to lysine production. This is fundamentally the same error that the district court made in the Christensen case, that it read the patent claim and five of the nine patents in Christensen claimed a firearm as part of their claims. And what the court said there was the firearm is the thing in which the invention goes, just like the bacterium here is the thing in which the genetic modifications go. But the problem here is that the ALJ made strong findings in connection with deliberate concealment that didn't exist in the Christensen case. Well, in the Christensen case, the district court made a finding that, in fact, the claimed parts could only be used in the M16 rifle. And what this court said is the patent doesn't claim a particular rifle. It claims taking these parts and using them in a rifle, any rifle. Now, in a factual record where the district court found they could only be used in one rifle, according to the argument of GBT and what the ALJ did here, that's the sole embodiment. Therefore, you had to include the instructions for the whole 160-part weapon. Now, just as Ajinomoto here was held to disclose everything it knew about host strains, which host strain happened to be best at that moment in the ALJ's perception? One of the reasons the priority issue makes sense is this 80-70 strain. Judge Lurie was thrown away months after the Japanese priority application was filed. Never used again. So it's absurd that the ALJ said, because you didn't disclose, and the nature of the disclosure is unclear, presumably since nobody called for a deposit. It would have been just putting in either some data or the name 80-70. Because you didn't disclose a worthless strain, your patent claim is invalid. And had you disclosed that worthless strain, it would be valid. To paraphrase the Christians in court, the law is not so foolish. There was never any debate that the only aspect of these claims that was not in the prior art, that was at all inventive, was the specific genetic modifications. And what the ALJ did by applying his strict liability rule, saying if you've got a preference, you've got to disclose it, without regard to that invention, was he invalidated the patents for failure to disclose what everybody agreed was in the prior art and obvious. The use of microorganisms. Any microorganism. That's what the 160 specification says, and that's what these patents were designed to do, was to show a way to make any E. coli better at producing lysine by making two very specific genetic modifications. And the ALJ simply took the patent and the best mode law and turned them on the head. And despite what Ms. Laporte said about the claim getting broader, you know it got narrower, as it went from just the gene down to this method claim. If they just possessed that gene here in the United States or anywhere else, it wouldn't be an infringement of this claim. They had to use it in a method. If they used a method that didn't require a liquid medium, no infringement, even if they used the gene. That's how narrow that claim was. And so what the ALJ did here was a fundamental departure. When Ms. Laporte said this goes to the core of the best mode, she's right, but for the wrong reason. It goes to the core of the best mode requirement because what the ALJ did here was to turn it into a strict liability test. In fact, a game of gotcha, where with the broad discovery allowed in American litigation and zealous defense counsel, you parse through all of the lab notebooks and research reports and you find anything that you can say the inventors had a preference for that relates to any word in a claim that you can pull out and look at in isolation. And then if that specific preference isn't disclosed in the patent, according to the rule this ALJ applied, that claim is in violation of the best mode and invalid. Any more questions for Mr. Malkin? Thank you, Mr. Malkin. This case is taken under submission.